(No. 35452.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM BENSON, JR., Plaintiff in Error.

*Opinion filed March 31, 1960.*

HAROLD S. ROSENFIELD, and McCOY, MING & LEIGHTON, both of Chicago, (GEORGE N. LEIGHTON, of counsel,) for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and FRANCIS X. RILEY and JOHN T. GALLAGHER, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Defendant, William Benson, Jr., was found guilty of murder after a jury trial in the criminal court of Cook County and was sentenced to the penitentiary for a term of 25 years. He prosecutes this writ of error and contends initially that the trial court erred in denying a timely motion for discharge for want of speedy prosecution.

The record reveals that defendant was arrested January 11, 1958, and remained continuously in custody without being admitted to bail until his trial on June 17, 1958, a period in excess of five months. The chronological order of events occurring during the interim is as follows:

January 14—Leave granted in municipal court to Lu-

cille Burton, a daughter of the deceased, to file a complaint for a preliminary examination in the case of People of the State of Illinois v. William H. Benson, Jr. The court took jurisdiction and, on motion of the People, set the hearing for February 11, 1958.

February 11—On motion of the People, the municipal court reset the hearing for March 7, 1958.

March 7—Cause continued to April 7, on motion of the People.

April 3—Indictment against defendant returned to the criminal court of Cook County.

April 7—*Nolle prosequi* entered in municipal court on motion of the People.

April 11—Defendant entered a plea of not guilty upon arraignment and cause was set for trial on April 14, 1958.

April 14—Defendant demanded trial but, upon motion of the People, the cause was continued to April 30, 1958, with subpoenas.

April 30—On motion of the People, cause continued to May 2, 1958, without subpoenas; also, on motion of the People, the court ordered that defendant be examined by the Behavior Clinic and that the report be filed on or before May 2, 1958.

May 2—State's Attorney filed written motion requesting a continuance for sixty days, alleging it had come to his attention defendant had been recently confined to a mental institution, and that it was necessary for the prosecution to determine whether defendant's mental capacity was such as would enable him to stand trial. Over defendant's objection and demand for an immediate trial, a continuance was granted to June 17, 1958, with subpoenas.

May 20—Defendant filed motion for discharge under the provisions of section 18, division XIII of the Criminal Code, (Ill. Rev. Stat. 1957, chap. 38, par. 748,) alleging that he had been confined continuously since January 12, 1958, that he had neither been admitted to bail nor tried

within four months thereafter, and that the delay did not occur on his own application. Although the judge hearing the motion expressed an opinion that defendant was entitled to a discharge, he denied the motion, as well as a motion demanding trial instanter, and the proceedings were adjourned to June 17, 1958.

June 6—Defendant filed motion to quash count 1 of the indictment and hearing on the same was continued to June 17.

June 13—Motion of People for defendant to be examined in Behavior Clinic and for report before June 17, 1958; motion granted.

June 17—Defendant's motion for discharge renewed and again denied, after which his trial and conviction followed.

To implement the right to a speedy trial guaranteed by section 9 of article II of the Illinois constitution, the legislature of this State has enacted section 18 of division XIII of the Criminal Code which provides in part as follows: "Any person committed for a criminal or supposed criminal offense, and not admitted to bail, and not tried by the court having jurisdiction of the offense, within four months of the date of commitment, shall be set at liberty by the court, unless the delay shall happen on the application of the prisoner, or unless the court is satisfied that due exertion has been made to procure evidence on the part of the People, and that there is reasonable grounds to believe that such evidence may be procured at a later day in which case the court may continue the cause for not more than sixty (60) days." (Ill. Rev. Stat. 1957, chap. 38, par. 748.) This court has held that the statute is to be construed liberally since it is in conservation of the liberty of a citizen, (*People ex rel. Woodruff* v. *Matson,* 129 Ill. 591,) that its salutary provisions cannot be nullified by technical evasions, (*People* v. *House,* 10 Ill.2d 556,) and that its provisions are mandatory and confer upon an accused a substantial

54

and absolute right under the constitution. *People* v. *Still-wagon,* 373 Ill. 211; *People* v. *Emblem,* 362 Ill. 142.

In the present case it is undisputed that more than four months elapsed between the date of defendant's commitment and his trial and, from the record, it may likewise be conceded that defendant neither occasioned nor consented to the delay, and that he did not waive his right to a speedy trial. The determinative question then is whether the delay requested by the People for the purpose of inquiring into defendant's sanity was a permissible delay.

Defendant takes the position that ascertainment of the sanity of an accused is not one of the statutory grounds for continuance provided in the four-month statute, and thus urges that the continuance granted for such purpose was ineffective to toll the running of the four-month period. The People, starting with the premise that the trial, adjudication, and sentence of a person charged with a criminal offense, while insane, is a violation of due process of law, (*People* v. *Reeves,* 412 Ill. 555,) next call our attention to language of *People* v. *Burson,* 11 Ill.2d 360, 368-369, which states that the sanity of a defendant should be settled before any further steps are taken, if at any time before, during or after trial, the court, either from its observation or upon suggestion of counsel, becomes aware of facts which raise doubt of the sanity of the accused. Because of these principles of due process, it is urged that the exception of the statute which permits delay "to procure evidence on the part of the People," must be construed to mean that a continuance may be granted to enable the People to procure such evidence as is necessary to prosecute an accused with full due process. Alternatively, and because of the language in the *Burson case,* it is contended that it is immaterial whether the People moved to delay or not, since, once a doubt appeared, the mental capacity of the defendant had to be determined in order to meet constitutional requirements of due process.

When measured by the plain meaning of the words employed, we think it obvious that the legislature, in authorizing a continuance "to procure evidence on the part of the People," did not contemplate a delay for the purpose of inquiring into the sanity of the accused. However, the fact that a continuance for such purpose does not fall within the statute does not of itself entitle the defendant to discharge. The statute in question was enacted to implement the constitutional guarantee of a speedy trial. While language employed in *Newlin* v. *People,* 221 Ill. 166, 175, contains a suggestion that delay beyond the statutory time can be justified only on grounds expressly stated in the statute, that suggestion is not applicable here.

Considering the demands of due process, as outlined in *People* v. *Burson,* 11 Ill.2d 360, it is our opinion that, in a proper case, a delay necessitated for the purpose of ascertaining a defendant's sanity and mental capacity to be subjected to criminal prosecution is a permissible delay which does not impair or infringe upon the constitutional right to a speedy trial, or violate the statute enacted to implement the constitutional provision. However, a mere arbitrary suggestion of insanity will not suffice, and whether such ground constitutes a good cause for delay in a given case must be a matter resting within the discretion of the trial court, to be resolved from the particular facts and circumstances before it. On review, the ruling will not be disturbed unless the record shows a clear abuse of discretion. *People* v. *Kendall,* 7 Ill.2d 570.

In the present case the People's verified motion for continuance alleged that defendant had been confined in a mental institution within the recent past, and that it was necessary to determine whether he had the mental capacity to stand a trial. These allegations under oath were not denied by defendant, nor a hearing demanded thereon, leaving the trial court with but little choice to grant the continuance prayed. This is particularly true since the

allegation of confinement in a mental institution carried with it implications of an adjudication of insanity which the law presumes to continue until there is evidence to the contrary. (See: *People ex rel. McElhaney* v. *Robinson,* 413 Ill. 401.) Having stood idly by when the continuance was granted, defendant was and is in no position to avail himself of the four-month rule. To overcome his inaction defendant now claims the People's motion for continuance was a mere subterfuge inasmuch as no determination of his sanity was ever made. The record, however, reveals that an examination and a report to the court were made before the trial proceeded. Under the circumstances we conclude that the trial court did not abuse its discretion in granting the continuance, and that it did not thereafter commit error in denying defendant's motions for discharge.

Defendant's next contention, *viz.,* that the proof does does not establish his guilt beyond a reasonable doubt, requires some detail of both the charges against defendant and the proof introduced to sustain them.

The indictment returned against defendant was composed of two counts, the first of which was, in part, couched in the following terms:

"* * * that said William H. Benson, Junior then and there unlawfully, feloniously, wilfully, violently and of his malice aforethought made an assault in and upon the body of one Hester Burton, who then and there was a female person and who then and there was in the peace of the People of said State of Illinois; that said William H. Benson, Junior then and there unlawfully, feloniously, wilfully, violently and forcibly was engaged in the prosecution of a felonious intent, to-wit: the forcible rape of Hester Burton; and that in the prosecution of said felonious intent said William H. Benson, Junior then and there unlawfully, feloniously, wilfully and of his malice aforethought killed and murdered said Hester Burton.

"That is to say that said William H. Benson, Junior then and there feloniously and violently made said assault upon said Hester Burton, and that said William H. Benson, Junior then and there feloniously and forcibly ravished and carnally knew said Hester Burton against her will; and that in the commission of said rape upon said Hester Burton said William H. Benson, Junior thereby then and there caused said Hester Burton to suffer a mortal shock and a brain hemorrhage, of which mortal shock and said brain hemorrhage said Hester Burton thereafter died on the same eleventh day of January in the year of our Lord one thousand nine hundred and fifty-eight, in said County of Cook, in the State of Illinois aforesaid; and so the Grand Jurors aforesaid, upon their oaths aforesaid, do say that said William H. Benson, Junior unlawfully, feloniously, wilfully and of his malice aforethought killed and murdered said Hester Burton in manner and form aforesaid and by the means aforesaid;"

Count II, in essence, charged that defendant murdered Hester Burton by making an assault on her body by some violent and unknown means, and that he inflicted divers wounds, cuts, bruises, fractures and hemorrhages on various parts of her body from whence she died. The verdict returned by the jury found defendant guilty of murder in the manner and form charged in the indictment.

Pertinent facts drawn from the evidence show that in January, 1958, and for many years prior thereto, Hester Burton, a woman about 69 years old, lived with her adult daughter, Lucille, in four rooms of a second floor apartment located at 5945 S. Prairie Avenue in the city of Chicago. Defendant, whose father owned the building and resided on the same floor, was 25 years old and, since 1954, had lived in a room adjacent to the rooms of the Burtons. He was a frequent visitor in the Burton quarters and the two families were on friendly terms. On January 11, 1958, Hester Burton was recovering from a stroke but,

according to a defense witness, had full possession of her faculties and was able to converse and walk around the apartment. Lucille Burton left her mother alone in the apartment at 7:00 P.M. When she returned at 9:00 P.M. she looked into her mother's bedroom and saw defendant in the bed on top of her mother. It is undisputed that defendant was then engaging in an act of sexual intercourse with Hester Burton, and it is likewise uncontroverted that she died within a very short time after Lucille Burton had interrupted the act and summoned defendant's mother. Testimony for the prosecution tended to show that defendant had raped the deceased against her will, while it was the testimony of defendant that the intercourse had been voluntary and at the deceased's suggestion.

When one is charged with murder the elements which must be established are proof of death and proof of a criminal agency causing death, both of which must be established by the evidence beyond a reasonable doubt. (*People* v. *Wilson,* 400 Ill. 461.) In the present case, after giving due respect to the fact the jury resolved against defendant the conflicting evidence relative to the voluntary or involuntary nature of the sexual intercourse, it is our opinion the proof shows beyond reasonable doubt that an illegal act of rape was committed by defendant which, under some conditions, might be a criminal agency that could cause death. However, the principal question for determination here, as we view it, is whether the proof is sufficient to establish beyond reasonable doubt that either the illegal act of intercourse, or bodily assault preceding or accompanying it, did in fact cause the death of the decedent.

The only witness to testify on these issues was Dr. Victor Levine, a physician who examined the body of the decedent and performed an autopsy upon it the day following her death. After testifying there was a slight bleeding from the vagina and that spermatozoa had been found

therein, the doctor stated he had examined the head and found a swelling on the left temple, which indicated tissue damage, but had found no other exterior evidence of abnormality. When the head was examined internally he found an area of bleeding, described as being two inches by one and one-half inches in size, in the deep tissues of the scalp at the right temple; however, when the doctor was later cross-examined concerning this bleeding, it appears no record was made as to whether it was fresh bleeding or old bleeding that was found. The brain was likewise examined, and it was the doctor's testimony that it was considerably swollen, that there were areas of various sizes that had softened, and that "the blood vessels at the bottom of the brain were markedly hardened—in fact so hard that they are described as being like a pipe stem * * *." Additionally, microscopic examination of the brain showed signs of destruction of the brain tissues, and some brown pigment ordinarly left as the residue of prior leakage of blood into the brain tissue. Having stated these findings, the doctor was then asked if he had an opinion as to the cause of death and, over a defense objection that a proper foundation had not been laid, he replied: "In my opinion Hester Brown died as a result of a combination of several things. And the main thing was assault, including sexual assault with recent brain damage. And as a lesser cause, the older lesions of softening which were found in the brain."

On cross-examination Dr. Levine conceded that the blood in the vagina could have come from a tumor, ulcer or cancer, but reiterated his earlier opinion that it had emanated from a number of small purple hemorrhage areas he had noted in the labia minora of the vagina. He also stated that he had found no bruises or scratches on the head, face, neck, arms or trunk of the body, and that he had found no sign of injury or fracture of the skull. When questioned concerning the swelling he had discovered in the region of

the left temple, he agreed that it was caused by edema, *i.e.,* an excess collection of body fluids where they are normally not found, and stated he could tell by looking that the fluid was not blood in this instance. He likewise agreed that it is common for edema fluids to collect when a person has a bad heart, and stated that he had made no examination of the decedent's heart, kidneys, or lungs. Concerning his examination of the brain, he testified the blood vessels at the bottom of the brain were sclerotic, a condition commonly known as hardening of the arteries, that the brown pigment indicated extravasation, *i.e.,* blood seepage and bleeding, which had occurred as long as weeks or months before his examination was made, and that the softening of the brain he found could have resulted from numerous causes.

Thereafter, on redirect examination, the witness expressed an opinion that the vaginal bleeding, the swelling near the left temple and the internal bleeding near the right temple all were due to some form of force or trauma. When further examined by defendant's counsel, he testified that force or trauma would not necessarily cause discoloration of the skin.

Upon a consideration of this evidence it is our opinion that proof is lacking beyond reasonable doubt that the death of Hester Burton in fact resulted from the illegal act of intercourse or from any other criminal agency for which defendant was responsible. There is no evidence which explains how an act of sexual intercourse could cause any of the conditions found in the head and brain of the deceased, or how sexual intercourse alone, or in combination with pre-existing conditions, could have resulted in death. Neither is there convincing proof that any condition found in the head or brain was caused by force or trauma, let alone that they were caused by a bodily assault committed by defendant. No cuts, bruises or abrasions were found on the head, face or other parts of the body, and there was no

proof of injury or fracture of the skull. The swelling on the left temple was edema which admittedly was not blood and could have had many causes, and there is no certainty as to its cause in this instance. With regard to the internal hemorrhage discovered in the area of the right temple, it was not definitely established whether it was new blood. This failure becomes significant in view of the testimony relating to the sclerotic condition of the blood vessels in the head and the evidence showing there had been extravasation of blood into the brain for as long as weeks and months before the decedent's death.

As has been pointed out in several decisions of this court, it is a maxim of our law that where an act may be attributed to a criminal or to an innocent cause it will be attributed to the innocent cause rather than to the criminal one. A crime is never presumed where the conditions may be explained on an innocent hypothesis. (*McCoy* v. *People,* 175 Ill. 224; *People* v. *Ahrling,* 279 Ill. 70; *People* v. *Wilson,* 400 Ill. 461.) Additionally, it is not for the defendant to establish his innocence, but for the People to establish his guilt. Here, as we have stated before, the proof is lacking to establish the cause of death beyond reasonable doubt. It is true that the medical witness expressed an opinion that one cause of death was assault including sexual assault, but there is no evidence which relates this conclusion to the bodily conditions his examination revealed. At the same time, it was his testimony that old brain lesions, for which no one was criminally responsible, were also a cause of death. Too much is left to inference and speculation that a criminal agency caused or contributed to the cause of death, and it is our opinion that defendant cannot be found guilty of murder or deprived of his liberty on so tenuous a basis.

The judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*