Reuben Schwartz, Individually and as Administrator of the Estate of Cynthia Schwartz, Deceased, Plaintiff-Appellant, v. The Peoples Gas Light and Coke Company, a Corporation, Defendant-Appellee.

Gen. No. 48,418.

First District, First Division.

March 26, 1962.

Director & Liebenson, of Chicago (Harold A. Liebenson, Harry J. Director and John E. Harris, of counsel), for appellant.

Ross, McGowan & O'Keefe, of Chicago (George J. O'Grady, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

This suit was filed to recover damages for personal injuries suffered by Reuben Schwartz and his wife, Cynthia,* in a fire allegedly caused by defendants' negligence in repairing a gas range. At the close of plaintiff's evidence the trial court granted both defendants' motions for a directed verdict and entered judgment thereon. Plaintiff has appealed against Peoples Gas Light and Coke Company, assigning no error as to the granting of the directed verdict in favor of defendant Jennie K. Applebaum, plaintiff's landlord.

The only issue before us is the propriety of the directed verdict in favor of Peoples Gas Light and Coke Company. Thus we must determine whether there is in the record any competent evidence, standing alone, together with all reasonable inferences to be drawn therefrom and taken with its intendments most favorable to the plaintiff, which tends to prove the material elements of plaintiff's case against the defendant company. Paul Harris Furniture Co. v.

---

* Cynthia Schwartz died on July 12, 1960, and Reuben Schwartz, as duly appointed administrator of her estate, was substituted as plaintiff.

Morse, 10 Ill2d 28, 35, 139 NE2d 275; Lindroth v. Walgreen, 407 Ill 121, 130, 94 NE2d 847.

The record indicates that at the time of the fire plaintiff and his wife had been living in their second-floor apartment for about fifteen years. The landlord furnished the apartment with the gas range in question, which, by stipulation, appears to have been manufactured in 1931 or 1932, and contained a Robert Shaw thermostat. The janitor of the building made all general repairs, although the landlord would not permit him to work on gas ranges, preferring instead to have the tenants call in the gas company for such matters.

Reuben Schwartz testified that in January or February of 1952 his wife, after discovering that the oven would not bake properly (the items would turn out either partially uncooked or overdone), called in the janitor to look at the stove. Unable to find the difficulty, the janitor did nothing more than to place a screw and clamp in copper tubing running from the back to the roof of the stove to prevent the tubing from hanging down. He did not work with the knobs. About a week later an employee of the defendant gas company, upon request, called on the Schwartzes. After lighting the oven and testing it with a thermometer he took apart the thermostat on the range and worked on it. He reassembled the thermostat, relit the oven, tested it again with the thermometer, and stated that the stove was in good working condition. When Cynthia subsequently did some baking it appeared that the oven still would not cook satisfactorily. Several weeks later another gas company repairman called on the Schwartzes and, after working on the thermostat and testing the oven, told them that it was "okay now."

Reuben provided the only testimony concerning the fire. He stated that on September 24, 1952, at about

27

■■■■■■■■■■■■■■■■

2:00 p. m., his wife placed a beef roast in an aluminum pan, covered it with a lid containing a "vent cap," and put it in the oven. The thermostat knob was set at 350 degrees. About two hours later, while the roast was still cooking, Cynthia baked a pie crust and removed it from the oven. Reuben stated that he had been in the kitchen most of the afternoon, and that nothing unusual happened when his wife removed the pie crust from the oven. About fifteen minutes later (approximately 4:30 p. m.) Reuben went to the bathroom to wash up. He had been there about five minutes when he heard his wife say she was on fire. He ran into the dining room and, seeing his wife ablaze, attempted to smother the flames with turkish towels. This proving unsuccessful, he tore off her clothes, led her into the living room, wrapped her in a coat, and sat her down on a couch. He then returned to the kitchen (in point of time, about five minutes after he had first seen his wife in flames). Although the room was quite smoky, he could see a narrow flame, as if from a blowtorch, shooting out from the open broiler drawer about two feet into the room. He turned the oven key to "off" and the flame immediately disappeared. The linoleum floor was burning at a spot in front of the stove and to the left of the broiler oven. The kitchen table legs were also on fire. He extinguished the flames with water. Subsequently, the fire department arrived and took him and his wife to the hospital.

Reuben further testified that a short time after the fire he called in the owner of a neighborhood appliance repair shop who tested the range with a thermometer and checked to see if, after the oven heated, the flame reduced. Reuben stated that the repairman did nothing to the stove other than light it and put in the thermometer. The record does not reveal what, if any, conclusions that repairman reached concern-

ing the condition of the stove. About a month after the fire two of defendant's employees inspected the stove. They set the thermostat at 350 degrees, lit the oven, and waited for it to heat up. Reuben stated that the thermometer read more than 200 degrees higher than the thermostat setting. The repairmen said, "boy this thing is high." After one of the men worked on the thermostat for a while they gave Reuben a work ticket and left. Reuben stated that from the time defendant's employees called in January, February or March of 1952 until the time of the fire no one else inspected or worked on the range.

Plaintiff contends that the defendant Gas Company, the exclusive supplier of illuminating gas (an inherently dangerous element), which maintains a service department relied upon by its customers, negligently repaired or adjusted the thermostat on the gas range creating the condition which proximately caused the injuries to him and his wife.

Defendant argues that, since a gas company is not responsible for the continued operation and maintenance of the appliances of its customers, there was no proof of negligence; that there was a total failure to prove proximate cause, the only evidence thereof being conjectural; and that the fire was due to the ignition of grease deposits of long standing in the broiler tray.

■ Plaintiff's case rests largely upon the testimony of an expert witness who was a mechanical engineer trained and educated upon the subject of combustible materials and thermostats. He stated that, while he was not familiar with the gas range in question, he was familiar with gas ranges in general and their principles of operation, and with the Robert Shaw thermostat. In response to a hypothetical question given over defendant's objection he testified that, in his opinion based upon a reasonable degree of

29

scientific certainty, there might or could have been a causal relation between the condition of the stove and the fire.

The expert witness never examined or tested the gas range. He based his opinion upon the fact that, during the time the beef roast was heating, the fat on it would melt, turn to vapor, and conceivably could escape through the vent cap on the roaster lid. The vapor could then permeate throughout the oven and, if the oven door were opened, would be mixed with air forming a combustible substance. If the oven temperature were between 500 and 550 degrees Fahrenheit the flash point of this combustible mixture of fat vapor and air would be reached and, with the gas flame providing the ignition source, the result could be a flash fire. He explained that at 350 degrees Fahrenheit the flash point of the combustible mixture would not have been reached, but that a temperature over 500 degrees creates a dangerous situation. He further explained that, because of the openings permitting the flow of air from the top to the bottom of the oven, the vapor could have gone down into the broiler and come in contact with the ignition source causing the fire.

On cross-examination the expert admitted that he did not know what the explosive mixture, or ratio of air to fat vapors, would be. He said this would be difficult to determine without testing, and would depend upon the amount of gas being burned at the same time. He could estimate the explosive ranges for the fat, but it would only be a guess. Further, the expert admitted that, while he assumed in his answer to the hypothetical that the vapors went down into the broiler, and he could offer that as a possibility, it is also possible that the fat vapors went up. He "couldn't venture a guess" as to which was the greater possibility, and admitted that he "didn't know"

whether the vapors went up or down. He said he did not know the density of the fat vapors, and that they may or may not have been heavier than air. Acknowledging that the hotter a gaseous substance is, the lighter it will be, and that gasses lighter than air will naturally rise, he explained that the hot fat vapors still might not rise under the circumstances in question because they might not be hotter than the gasses around them, and because of the additional factor of the convection currents inside the oven as the air is being mixed in there. At the same time, the expert verified the fact that exhaust vents are put on a stove for the release of gasses, that exhaust gasses ordinarily rise and escape through the vents, and that fat vapors would escape the same way. Moreover, he stated that fat vapors would escape when the oven door is opened, as when Mrs. Schwartz put in and removed the pie crust.

The cross-examination of this expert further revealed that it is highly doubtful that the fat vapors would feed a flame of two feet in length for four or five minutes. He said that the vapors would be consumed in a few seconds although he could "conceive" of the vapors continuing down into the broiler since the roast was still hot and would continue to emit vapors. He added that, at 350 degrees, considerable grease in the broiler tray would support a fire for four or five minutes.

██ ██ The normal function of a witness is to state facts within his personal knowledge. His opinions are, in general, irrelevant. To this general rule there is an important exception making admissible the opinion of an expert. He is considered qualified to provide the often necessary function of drawing inferences from facts which the jurors would not be competent to draw. As a safeguard upon the reliability of such testimony, however, the expert witness, no matter how skilled or experienced, will not be permitted to guess

31

or state a judgment based on mere conjecture. (Lyons v. Chicago City Ry. Co., 258 Ill 75, 80, 81, 101 NE 211; Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 530, 34 NE2d 732.)

From the information elicited through cross-examination of the expert it is quite apparent that his answer to the hypothetical question of causation was based on sheer conjecture. In effect, he concluded that there might be a causal connection between the condition of the stove and the fire if one were to assume an essential fact which he characterized as only a possibility, and which was not supported by any other evidence. That fact, of course, was the direction in which the fat vapors travelled. The expert ultimately admitted that the theory upon which he based his conclusion could not, by itself, account for the type of fire that took place. We find, therefore, that the expert's testimony was of no probative value upon the question of proximate cause. Since plaintiff offered no other evidence of proximate cause, there was a total lack of proof of a material element of the cause of action, and the case was not entitled to jury consideration.

■ Plaintiff's lack of proof extended to a material aspect of the issue of negligence, as well as proximate cause. The repair work done by defendant was performed about 7 months before the fire, and the range was used for broiling and possibly even for roasting during the intervening period. The only evidence offered to show a defective condition in the range at the time of the fire was the discovery, one month after the fire, of a 200 degree variance between the thermometer and the thermostat. Plaintiff offered evidence to show that no one worked on or altered the condition of the stove during that month. Nonetheless, the condition of the thermostat one month after the fire is not competent evidence, direct or circumstantial, of the condition of the thermostat at the

32

time of the fire. (Hollon v. Campton Fuel and Light Co., 127 Ky 266, 105 SW 426, 428.) The fire, though in the lower part of the oven, was of five minutes duration, and the expert verified the fact that a thermostat is a highly sensitive instrument which could be damaged by intense heat. The offered evidence thus would not support an inference of a defective condition in the range at the time of the fire.

Plaintiff offered no other evidence of a defective thermostat. Moreover, he did not attempt to show the precise conduct of defendant's repairmen which constituted negligence. Without such evidence it is clear that the jury could not have returned a finding of negligence.

The lack of competent evidence showing a defective condition in the range at the time of the fire additionally gives further cause to reject the expert's answer to the hypothetical question. The expert's answer was based on the assumption that a defective thermostat was causing the oven to maintain a temperature in excess of 500 degrees, which, as we have indicated, was not supported by the evidence. "The opinion of an expert is to be allowed only if it is based on and supported by facts in evidence." Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 530, 34 NE2d 732.

Upon the question of both negligence and proximate cause the plaintiff failed to produce any competent evidence from which the jury could make a determination in his favor. The trial court properly directed a verdict for defendant Peoples Gas Light and Coke Company, and the judgment of that court is affirmed.

Affirmed.

MURPHY, P. J. and ENGLISH, J., concur.