THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TERRY SEAMAN, Defendant-Appellant.

Fifth District No. 5—88—0357

Opinion filed August 30, 1990.

872

RARICK, J., specially concurring.

Clyde L. Kuehn, of Kuehn & Rhein, of Belleville, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle,

Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Terry Seaman, appeals from his convictions on March 29, 1988, on counts of attempted murder, aggravated battery, and armed violence following a jury trial held in the circuit court of St. Clair County. The jury found him guilty but mentally ill on each count, and he was sentenced concurrently on the counts of attempted murder and armed violence to nine years in the Department of Corrections.

Defendant raises the following issues on appeal:

(1) whether the Illinois law providing for a special verdict of guilty but mentally ill is constitutional;

(2) whether defendant's statutory right to speedy trial was violated such that his motion for discharge should have been granted by the trial court;

(3) whether the trial court erred in admitting the testimony of the State's expert on insanity;

(4) whether the trial court erred in granting the State's motion to remove two prospective jurors for cause; and

(5) whether the State failed to prove beyond a reasonable doubt that the defendant was mentally ill at the time of the incident such that the jury's verdicts finding him guilty but mentally ill were against the manifest weight of the evidence.

The defendant is a 25-year-old male who was married at the time of the incident to the victim, Jonna Seaman. They had a two-year-old daughter, Nicole.

At the age of 14, the defendant had been found lying unconscious in a street in Iran where he had been living with his parents. Prior to this incident the defendant had been a nearly straight A student. However, within a year his grades turned to D's, F's and incompletes, and his behavior markedly changed. He was later diagnosed with temporal lobe epilepsy after an EEG indicated brain damage. His mother recalled an incident during high school when he had left a note written in his own blood and sneaked out of the house to avoid going to a family dinner after he had insisted on being with his friends that evening. She also testified that the defendant's bizarre behavior was associated with use of alcohol.

The defendant received his diploma from high school in 1981 but was required to attend summer school in order to do so. Following high school he was unemployed until obtaining a job delivering papers

for the Belleville News-Democrat. He married Jonna in September 1984, and Nicole was born a year later. The defendant took care of the baby during the day, collected for his route in the early evening, and awoke at 2 a.m. so that he could deliver the 500 papers on his route. The defendant had recently left that job and had obtained a job with a sheltered care workshop for handicapped adults, stocking grocery shelves at the Scott Air Force Base Commissary.

In August 1987, the couple began having marital problems. One evening after an argument with his wife, the defendant went to a local tavern and consumed one beer. When he returned home, the argument resumed, and he began slashing some of their furniture with a knife. When the baby started crying, the defendant stopped the slashing, put the baby back to sleep and then resumed the slashing. A few weeks later during another argument with his wife the defendant punched her in the eye. Jonna then left with Nicole and moved in with her parents. She obtained an order of protection and filed for divorce in late September 1987.

On October 7, 1987, on a busy Belleville highway during afternoon rush hour, Jonna Seaman noticed the defendant's car behind her. At the intersection he called to her to pull over so they could talk. When she refused, the defendant pulled in front of her car, forcing her to pull over on the shoulder of the highway. The defendant slipped a fishing knife in the sleeve of his coat and went back to his wife's car. They argued for a short time while Jonna was still seated in her car. When the defendant apparently dropped something and stooped to pick it up, Jonna testified she opened her car door and noticed the knife. Jonna pushed the defendant with the door and attempted to exit the area when the defendant began stabbing her in the back, saying that if he couldn't have her, nobody could. Two passing motorists saw the altercation and came to Jonna's assistance, but were unable to free her and the knife from the defendant's grip until she had been stabbed a total of 22 times. Most of her wounds were to the back and chest area. She suffered a collapsed lung. Her most serious injury was to her left index finger. At some point during the attack the defendant grasped the blade of the knife rather than the handle and his hand was cut down to the bone and tendon.

After the attack, the defendant quietly waited for the police. He was reported to have had a blank stare on his face and to periodically twitch. The two responding officers reported that he appeared calm, spoke intelligently and understood their questions. He gave the police a signed statement wherein he explained the attack as a result of being angry with his wife about their marital problems.

Later that evening he called his mother from jail and asked her to bring him his prescription for Dilantin, a drug to control his seizures. Although he told her he was in jail he failed to convey the seriousness of what had happened. His mother assumed he had been arrested for violating the order of protection. The defendant was charged the next day by information with attempted murder, armed criminal violence and aggravated battery. His parents learned of the incident that day when they read the newspaper.

The jail physician had given the defendant Ativan, a mild tranquilizer, to relieve anxiety. He was kept in an isolation cell for fear that he would be harmed by another prisoner because of his bizarre behavior, or that he would commit suicide. Although originally held in lieu of $75,000 bail, the State obtained an order revoking bail on October 29, 1987. Notice was given to the State in early November 1987, by way of discovery response, of defendant's intent to claim the affirmative defense of insanity and of the defense's expert witness in that regard, Dr. Daniel Cuneo. Dr. Cuneo, a clinical psychologist, examined the defendant for fitness to stand trial as well as insanity.

Dr. Cuneo originally found the defendant unfit to stand trial and so informed the State's Attorney. The State's Attorney informed the defendant's attorney that he wanted to have the defendant examined for fitness. Dr. Cuneo later changed his opinion on the defendant's fitness for trial, and this was also conveyed to the State's Attorney. The State's Attorney obtained an *ex parte* order from the court to have the defendant examined for fitness on December 7, 1987. No written motion was served on the defense, nor was a record made of any hearing prior to the entry of the order, which recited that *bona fide* doubt as to the defendant's fitness to stand trial had been raised, and appointed Dr. Joseph Shuman to evaluate the defendant's fitness to stand trial.

Dr. Shuman, a neuropsychiatrist, examined the defendant for fitness for approximately two hours on December 16, 1987. His report on this examination was delivered to the State on December 21, 1987. The defense announced ready for trial on January 11, 1988. The court continued the trial so that a hearing on fitness could first be held. The hearing on fitness was held February 2, 1988, and the State's expert opined that it wasn't even "a close call" and that the defendant showed no symptoms of any kind of serious mental illness. Dr. Shuman also testified at the fitness hearing that he could give a "guesstimate" as to the defendant's sanity.

The defense filed a motion for discharge for failure to try the defendant after 168 days of incarceration. The court denied this mo-

tion, noting that based on the affirmative defense of insanity being raised and Dr. Cuneo's representations to the State, it believed the State properly raised a *bona fide* doubt of the defendant's fitness. The jury trial proceeded on March 24, 1988.

Following *voir dire* the State moved to strike two jurors for cause. The first juror had admitted being charged with a burglary and replied negatively when asked whether he understood and agreed with the proposition that a person is presumed innocent unless proven guilty. The second juror had twice been a victim of a crime and said that he might be prejudiced because of it. The court removed these jurors over the defense's objection.

At trial, the defendant testified that during his separation from Jonna he was not going to work and was drinking more than usual. On the day of the incident, he had returned from work early in the morning, and after his wife had told him on the phone that they were through, had consumed two or three rum and Cokes. He then went to sleep.

The defendant testified that he remembered that Jonna had accidentally jumped onto the knife but did not remember stabbing her 23 or 24 times and did not remember hearing her scream. In spite of what had happened, he still planned to ask for custody of their daughter.

Cheryl Prost, a psychological consultant for the court system in St. Clair County, had seen the defendant on numerous occasions following his arrest. She testified that the defendant knew he had done something wrong but did not appreciate how serious the incident had been.

Dr. Cuneo testified that he had examined the defendant on three occasions. He diagnosed the defendant as having organic personality syndrome, aggravated by alcohol abuse, and resulting from temporal lobe epilepsy. He testified that his examination indicated that the defendant had all five of the diagnostic criteria for organic personality syndrome: affective instability with severe mood swings, outrageous rage reaction, markedly impaired social judgment, marked apathy and indifference, and paranoid ideation. He gave an expert opinion that the defendant's mental disease or defect did not allow him to appreciate the criminality of his conduct when he stabbed his wife. He based his conclusion of legal insanity on the combination of the defendant's epilepsy with the use of alcohol. He further stated that the defendant did not have to be having a seizure at the time of the incident but that the personality structure caused by the brain damage could explain his behavior. He also opined that the defendant was not guilty

but mentally ill because his mental illness was the major reason the crime occurred; if one is guilty but mentally ill, he would be impaired by brain damage, but the crime would be unrelated to the mental illness.

Dr. Shuman testified as a rebuttal witness for the State, over objection of the defense, that he had examined the defendant but once and that was for the purpose of determining fitness for trial. Shuman testified that in addition to this examination he had reviewed the police reports, witness accounts and medical history and had concluded that the defendant's behavior during the attack was a voluntary loss of control. He stated that while the defendant had an ongoing mental illness in his seizure disorder, this would not affect his ability to understand the wrongfulness of his conduct and his ability to conform to the requirements of the law. He admitted during cross-examination that alcohol could affect the defendant differently than an ordinary person because of the brain damage.

The defense moved to exclude instructions of law conforming to section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 6—2), which deals with criminal responsibility as affected by mental disorder, arguing that this law was an unconstitutional violation of the defendant's right to due process and equal protection under the law. The court gave these instructions over the objection of the defense.

■■■■ The first issue we shall address is whether the trial court erred in denying the defendant's motion for discharge for violating his speedy trial rights under section 103—5 of the Code of Criminal Procedure of 1963, which provides in pertinent part:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, by an examination for fitness ordered pursuant to Section 104—13 of this Act, by a fitness hearing, by an adjudication of unfitness to stand trial ***.
>
> * * *
>
> (d) Every person not tried in accordance with subsections (a), (b) and (c) of this Section shall be discharged from custody ***." (Ill. Rev. Stat. 1987, ch. 38, par. 103—5.)

The issue of defendant's fitness for trial may be raised by the defense, the State, or the court before, during or after trial. If a *bona fide* doubt as to fitness has been raised, the court shall order a determination of the issue before proceeding further. (Ill. Rev. Stat. 1987, ch. 38, par. 104—11(a).) The court's failure to make such inquiry de-

prives a defendant of his constitutional right to a fair trial. (*Pate v. Robinson* (1966), 383 U.S. 375, 385, 15 L. Ed. 2d 815, 822, 86 S. Ct. 836, 842.) The determination of whether a *bona fide* doubt of the defendant's fitness exists rests within the sound discretion of the trial judge, who is in a superior position to observe and evaluate the defendant's conduct. (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 225, 498 N.E.2d 547, 555.) An examination for fitness ordered under this section operates to toll the speedy trial term. *People v. Sonntag* (1984), 128 Ill. App. 3d 548, 558, 470 N.E.2d 631, 638.

In the instant case it was the State that raised the issue of the defendant's fitness on December 7, 1987. The record indicates that this was by oral motion, and the State acknowledges that defense counsel had no notice of the motion, but states that counsel had been aware that the State was going to move for a fitness evaluation and expressed no objection. There was no record of any hearing; neither the defendant nor his attorney was present. However, the order states that *bona fide* doubt as to defendant's fitness to stand trial had been raised. Defendant contends on appeal that the *ex parte* motion for examination of the defendant to determine fitness for trial was not made in good faith, but for the purpose of depriving him of his right to speedy trial.

The supreme court has outlined the parameters of the inquiry into whether defendant's due process rights have been violated by the State's request for fitness examination:

> "[I]n a proper case, a delay necessitated for the purpose of ascertaining a defendant's sanity and mental capacity to be subjected to criminal prosecution is a permissible delay which does not impair or infringe upon the constitutional right to a speedy trial, or violate the statute enacted to implement the constitutional provision. However, a mere arbitrary suggestion of insanity will not suffice, and whether such ground constitutes a good cause for delay in a given case must be a matter resting within the discretion of the trial court, to be resolved from the particular facts and circumstances before it. On review, the ruling will not be disturbed unless the record shows a clear abuse of discretion." *People v. Benson* (1960), 19 Ill. 2d 50, 55, 166 N.E.2d 80, 83.

In *People v. Count* (1976), 42 Ill. App. 3d 715, 356 N.E.2d 435, the defendant had similarly alleged as error that the State's motion for fitness hearing had been made for purposes of delay, that the information before the trial court was insufficient to raise a *bona fide* doubt as to his fitness to stand trial, and as a result he was entitled

to discharge for want of prosecution within the 120-day term. The reviewing court held that the trial court did not abuse its discretion in determining that *bona fide* doubt as to defendant's competency had existed in granting the State's motion such that defendant was not entitled to discharge. The appellate court noted that the court was aware of the defendant's past psychiatric disorders and the State's motion also presented new information that the defendant had recently been transferred to Menard for evaluation after complaining of hearing voices and seeing visions. There was also no evidence of intent to delay because two co-defendants in the indictment were tried as scheduled. *People v. Count*, 42 Ill. App. 3d at 718, 356 N.E.2d at 437.

In *People v. Hugley* (1971), 1 Ill. App. 3d 828, 275 N.E.2d 178, the defendant successfully argued on appeal that the State's motion for fitness hearing was made in bad faith and for purposes of delay. The appellate court noted that the State's petition alleged that the defendant attempted to do violence to himself and others and was admitted to the security hospital at Menard. However, at the time the petition was filed and order entered, the defendant had already been released from Menard with a finding that he was not in need of mental treatment. No notice of the filing of the petition had been given to the defendant or his attorney. Moreover, the petition was filed just two weeks before the 120-day term would have run. The court found that since no valid reason for questioning the defendant's ability to stand trial existed at the time the petition was filed, it was not filed in good faith, and held that to allow the petition to toll the statute would violate the defendant's right to a speedy trial. *People v. Hugley*, 1 Ill. App. 3d at 830-31, 275 N.E.2d at 180-81.

■ At the hearing on defendant's motion for discharge in the instant case, the court found that the State had raised *bona fide* doubt as to the defendant's fitness, based on the fact that insanity had been raised as an affirmative defense and that the defense expert had made conflicting representations as to the defendant's fitness. We find that it was reasonable for the State to seek resolution of the fitness issue. We also find that as insanity had been raised as an affirmative defense and Dr. Cuneo had already determined that he would testify as to the defendant's legal insanity, the State did not raise a mere arbitrary suggestion of insanity when it brought the motion before the court. Finally, we find, based on the record, no evidence of intent to delay on the part of the State in bringing the motion on December 7, 1987, only 60 days into the 120-day term, and find that the trial court did not abuse its discretion in determining that the facts and circum-

stances before it were sufficient to raise a *bona fide* doubt as to the defendant's fitness and in granting the State's motion for fitness hearing.

■ We next consider whether the court erred in admitting the testimony of the State's expert on sanity. An expert is qualified to provide the necessary function of drawing inferences from facts which the jurors would not be competent to draw. However, no matter how skilled or experienced, the expert will not be permitted to guess or state a judgment based on mere conjecture. (*Schwartz v. Peoples Gas Light & Coke Co.* (1962), 35 Ill. App. 2d 25, 31-32, 181 N.E.2d 826, 829.) Defendant claims that Dr. Shuman should not have been allowed to give an opinion on sanity at the trial since at the prior fitness hearing Shuman admitted that he examined defendant for the purpose of establishing fitness for trial but that he could give a "guesstimate" as to his sanity. Moreover, Dr. Shuman admitted at the trial that this examination for fitness was the only examination he made of defendant prior to trial. However, the State notes that Dr. Shuman also reviewed the eyewitness reports, medical history and his own notes from the examination prior to reaching an opinion on sanity for the trial.

■ A psychologist may give an opinion as to a defendant's sanity based upon his examination of the defendant and defendant's actions on the day of the crime. (See *People v. Hickman* (1986), 143 Ill. App. 3d 195, 200-02, 492 N.E.2d 1041, 1045-46; see also *People v. Martin* (1988), 166 Ill. App. 3d 428, 434, 519 N.E.2d 1085, 1089.) A review of Dr. Shuman's testimony in foundation for his opinion concerning defendant's sanity at the trial does not leave us with the inescapable conclusion that Shuman was guessing as to defendant's sanity. On the contrary, we find that the factual basis for his opinion of sanity was thoroughly outlined. At most, defendant can make an argument about the weight of Dr. Shuman's opinion, in comparison with the opinion of Dr. Cuneo, the defense expert on insanity.

■ This leads us to a consideration of the next issue, whether the defendant's mental illness was established beyond a reasonable doubt. Before the jury could have considered whether the defendant was guilty but mentally ill, it must have determined that the defendant was sane rather than insane. As the supreme court noted in *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, while the defendant must now prove insanity by a preponderance of the evidence, the State's burden still includes proof beyond a reasonable doubt of the defendant's sanity. (*Fierer*, 124 Ill. 2d at 188, 529 N.E.2d at 977.) Moreover, when the court submits the special verdict form of guilty

but mentally ill to the jury after determining that the evidence so warrants, the jury must unanimously find that the defendant was not legally insane, but mentally ill, at the time of commission of the acts charged. Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j).

Defendant argues that the State failed to establish his sanity beyond a reasonable doubt. As a general rule, the question of the defendant's sanity at the time of the offense is a question of fact for the jury and the jury's finding on the issue of insanity will not be disturbed unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. *People v. Spears* (1978), 63 Ill. App. 3d 510, 517, 380 N.E.2d 423, 428.

The State's expert, Dr. Shuman, found no organic brain syndrome, as did Dr. Cuneo, the defense expert. Dr. Shuman did admit that the medical history showed an ongoing mental illness in his seizure disorder; however, he felt this had nothing to do with the incident. He opined that with seizure disorder there is an involuntary loss of control, but in this case there was no evidence that the loss of control was involuntary. Dr. Shuman based this opinion on the following facts: that the defendant remembered what happened; that the behavior was in response to a perceived provocation; and that defendant's history of partial seizures would only involve simple repetitive acts like smacking of lips or playing with buttons. Dr. Shuman admitted that the defendant's judgment would be more severely affected by alcohol; however, he reported that the defendant had not told him about any use of alcohol on the day of the incident.

Dr. Cuneo, on the other hand, found that the defendant's mental disease prevented him from conforming his conduct to the requirements of the law. He admitted on cross-examination that there are people with temporal lobe brain disorder who can conform their judgments to the requirements of the law, but stated that in the defendant's case it was the combination of alcohol and the organic brain syndrome which prevented the defendant from conforming his judgment to the requirements of the law.

Other than the defendant's testimony that he had two or three alcoholic drinks at his mother's house the morning of the incident, no other witnesses could corroborate that information. Defendant's mother, Patricia Henderson, whose testimony substantiated the opinion that alcohol had been a trigger for the mental disease, saw the defendant that morning but did not testify that defendant consumed any alcohol in her presence. The defendant, however, testified that the alcohol was drunk at her home and that he then went to his own apartment to sleep. Neither Timothy Fahey nor Daniel Heil, the two

men who came to the victim's rescue, recalled smelling alcohol on the defendant's breath. The jury apparently concluded that alcohol was not the triggering factor for the defendant's attack on Jonna or that the conduct was involuntary because of aggravation by alcohol of his temporal lobe brain disorder.

■ The victim's testimony that the defendant had said, "[I]f I can't have you, nobody can!" indicates that the defendant was motivated in the attack out of anger or jealousy and that her refusal to speak to him about their separation provided the provocation. Moreover, the defendant's statement to police indicates that he was angry with Jonna about her unwillingness to talk to him and that he remembered stabbing her, some of which was intentional and some of which was accidental. The testimony of Fahey and Heil as well as that of the responding officers, Stumph and Dahm, indicated that the defendant was calm and in control of his faculties immediately after the incident. While one of the rescuers noticed a blank stare and twitching on the part of the defendant after the incident, this would be consistent with Mrs. Henderson's descriptions of her son's prior seizures, while the violent attack on Jonna would not. Dr. Shuman's opinion of the defendant's sanity was therefore corroborated by the lay witness testimony concerning defendant's mental condition. Lay opinions are admissible on the issue of defendant's sanity at the time of the offense if they are based on observations made shortly before or after the crime was committed. *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 35-36, 535 N.E.2d 1001, 1007.

■ The expert testimony was conflicting in this case. It is within the sound discretion of the trier of fact to resolve all contradictions in the expert testimony presented to it. (*Bouchard*, 180 Ill. App. 3d at 35, 535 N.E.2d at 1007.) The trier of fact is allowed to accept a part of any expert's testimony and reject other parts of the testimony; it may accept one expert's opinion over another or reject all expert testimony and rely solely on lay testimony to conclude that the defendant was sane. (*Bouchard*, 180 Ill. App. 3d at 35-36, 535 N.E.2d at 1007-08.) The jury resolved this conflict in favor of finding defendant sane at the time of the offense. This decision is supported by the opinion of Dr. Shuman and the lay testimony of Jonna Seaman, Timothy Fahey, Daniel Heil and Officers Stumph and Dahm, all of whom testified about the defendant's actions during or shortly after the incident.

■ Likewise the testimony of the above witnesses supports a decision that the State met its burden of proving beyond a reasonable doubt that the defendant was mentally ill at the time of the commis-

sion of the crime. As defined in subsection (c) of section 6—2 of the Criminal Code of 1961, mental illness means a substantial disorder of thought, mood or behavior which afflicted the person at the time of the commission of the offense and which impaired that person's judgment but not to the extent that he was unable to appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(c).) Both experts testified as to a mental disorder on the part of the defendant, though one characterized it as organic brain syndrome and the other as temporal lobe disorder. Both testified that the use of alcohol would trigger conduct over which the defendant would have no control, or that the defendant's judgment would be more severely affected thereby. Both testified that the mental disorder itself would not necessarily mean that the defendant would not be able to conform his judgment to the requirements of the law, but that the addition of alcohol would severely affect that judgment. The jury apparently determined that alcohol did not play a part in causing defendant's attack on Jonna Seaman. We therefore find that the jury's decision that the defendant was guilty but mentally ill was not against the manifest weight of the evidence or that its basis was passion or prejudice.

Defendant next argues the constitutionality, as applied to defendant, of the Illinois law of insanity and mental illness. Defendant contends that sections 6—2 of the Criminal Code of 1961 and 115—4(j) of the Code of Criminal Procedure of 1963 violate his right to fundamental fair treatment under the due process clause of the United States and Illinois Constitutions and under the equal protection clause of the fourteenth amendment to the United States Constitution.

■■■ ■ Defendant notes that in response to the attempted assassination of President Reagan in 1981, the Illinois legislature revised its laws on the insanity defense, shifting the burden of proving insanity to the defendant and interjecting the compromise verdict of guilty but mentally ill (hereinafter, GBMI). Defendant urges that the statute should be reviewed for due process and equal protection purposes under a strict scrutiny analysis rather than merely a rational basis analysis because a fundamental right, fair treatment in the judicial system, is involved. This same argument was made unsuccessfully by the defendant for equal protection purposes in *People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11, concerning section 5—2—6 of the Unified Code of Corrections, the sentencing section which provides for differing treatment of defendants found guilty but mentally ill. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—2—6.) The court outlined the equal protection judicial review analysis as follows:

"Generally, 'courts restrict their role to determining whether the particular legislative classification is rationally designed to further a legitimate State purpose.' [Citations.] When the legislation threatens fundamental constitutional rights or is directed towards a 'suspect' group, then—and only then—courts will examine the statute to insure that it is ' "tailored" narrowly to serve legitimate objectives' [citations] in furtherance of compelling government interests." (*Kaeding*, 98 Ill. 2d at 245-46, 456 N.E.2d at 16.)

The supreme court rejected the strict scrutiny argument, holding that section 5—2—6 did not threaten a fundamental constitutional right. (*Kaeding*, 98 Ill. 2d at 246, 456 N.E.2d at 16.) We likewise believe that sections 115—4(j) and 6—2 do not threaten a constitutional right, and we will limit our inquiry to whether the GBMI classification has a rational basis. It is defendant's burden to demonstrate the impermissible nature of the classification created. (*People v. Smith* (1984), 124 Ill. App. 3d 805, 812, 465 N.E.2d 101, 106.) Defendant has advanced nothing in his brief to persuade us that the statute deprives defendant of equal treatment among citizens similarly situated. In fact, we are unable to discern from defendant's argument what impermissible classification may here be involved. Accordingly, we hold that sections 6—2 and 115—4(j) do not deprive defendant of equal protection under the law.

■■ ■ As we have already determined that a fundamental constitutional right is not threatened by sections 6—2 and 115—4(j), our review for substantive due process purposes need only involve the reasonableness of the law. When determining whether a statute violates due process, the court must determine whether the statute is reasonably designed to remedy the evils the legislature has determined to be a threat to the public health, safety, and general welfare; due process requires only that the statute be reasonably designed to accomplish its purposes, not that it be the best means of accomplishing them. (*Smith*, 124 Ill. App. 3d at 811, 465 N.E.2d at 105-06.) The court in *People v. Smith* found that because the guilty but mentally ill statute is clearly rationally designed to accomplish the legislative goal of reducing the number of persons erroneously found not guilty by reason of insanity and to characterize such defendants as in need of treatment, the statute does not violate due process. (*Smith*, 124 Ill. App. 3d at 811, 465 N.E.2d at 106.) Notwithstanding, defendant urges us to reject the reasoning of the court in *People v. Smith*, arguing that due process requires more than just accomplishing a goal which the legislature has in mind, to wit, reducing the number of per-

sons erroneously found not guilty by reason of insanity. Defendant argues that the guilty but mentally ill law was not designed to reduce error but reduce the number of verdicts of not guilty by reason of insanity (hereinafter, NGRI). Defendant suggests that insertion of the GBMI verdict, in effect, supplants or abolishes the insanity defense. However, as the court noted in *People v. Smith,* the guilty but mentally ill statute does not chill the assertion of the insanity defense because of a purported compromise verdict since the defendant must first be found guilty of the crime and then found legally sane before this verdict may properly be considered by the jury. (*Smith,* 124 Ill. App. 3d at 811, 465 N.E.2d at 106.) As we believe that to be the more appropriate inquiry, we find the Illinois law on insanity and mental illness rationally based on a legitimate legislative purpose and that it does not violate defendant's right to due process.

Defendant next argues that sections 6—2 and 115—4(j) violate due process for reasons of vagueness. The Illinois statute which defines the elements composing the verdicts of not guilty by reason of insanity and guilty but mentally ill provides in pertinent parts as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) '[M]ental illness' *** means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." Ill. Rev. Stat. 1987, ch. 38, par. 6—2.

The GBMI verdict is set forth in section 115—4(j), which in part provides:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty

but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict, but that such special verdict requires a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j).)

Defendant argues that the GBMI verdict, on its face, is an unconstitutional denial of due process because it interjects irrelevant and misleading elements of thought into the determination of guilt or innocence, and in its application detracts from logical, reasoned, and fair determination on the basic issue of guilt or innocence. These same arguments were made by the defendant and rejected by the court in *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742. As the court noted in *DeWit*, "[w]e are not persuaded that the possibility of a compromise verdict is a constitutional infirmity where the jury still must make a determination in the first instance between whether a defendant is guilty or legally insane based upon the evidence at trial." (*DeWit*, 123 Ill. App. 3d at 736, 463 N.E.2d at 750.) The court further found that section 115—4(j) expresses its requirements in simple and clear language and that the definition of mental illness provides meaningful standards for the jury to make the required findings. (*DeWit*, 123 Ill. App. 3d at 736, 463 N.E.2d at 750.) Finally, the court noted that the defendant's arguments were more in the nature of policy issues which are more properly left to the State legislature to determine. (*DeWit*, 123 Ill. App. 3d at 736, 463 N.E.2d at 750.) We also believe that to be the more appropriate venue for defendant's policy issue arguments.

Defendant urges that instructions based on section 6—2 are confusing to the jury because while "mental illness" for purposes of GBMI is defined, "mental disease or defect" for purposes of NGRI is not defined except in the negative, *i.e.,* "does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct," and this makes defendant's burden of proof on insanity all the harder. However, we believe that section 6—2(a) further defines the test for legal insanity: "he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(a).) As another court of review recently concluded when faced with this identical argument, this provision should not be invalidated merely because it attempts to describe "mental disease or mental defect"

rather than to list each and every condition which may fall into this category. (*People v. Kapsalis* (1989), 186 Ill. App. 3d 96, 105, 541 N.E.2d 1323, 1328.) We likewise decline to find section 6—2 violative of due process for vagueness reasons.

Finally, defendant urges that requiring the defense to prove insanity by a preponderance of the evidence violates the due process clause of the United States and Illinois Constitutions. The constitutionality of the statute which, in January 1984, shifted the burden of proving insanity to the defendant by a preponderance of the evidence has previously and unsuccessfully been challenged on appeal on these same grounds. For example, this court has upheld the constitutionality of section 3—2 of the Criminal Code of 1961, which sets forth that if the affirmative defense of insanity is raised, the defendant bears the burden of proving by a preponderance of the evidence his insanity at the time of the offense. (Ill. Rev. Stat. 1987, ch. 38, par. 3—2.) In *People v. Hightower* (1988), 172 Ill. App. 3d 678, 526 N.E.2d 1129, we held that the insanity statute which shifted the burden of proving insanity to the defendant did not violate guarantees of due process under either the United States or Illinois Constitutions. (*People v. Hightower*, 172 Ill. App. 3d at 693-94, 526 N.E.2d at 1138.) Section 6—2(e) of the Criminal Code of 1961, which also refers to the shift of the burden of proving insanity to the defendant, states:

> "(e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of each of the offenses charged, and, in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(e).)

The constitutionality of this section of the Criminal Code has been upheld in *People v. McDarrah* (1988), 175 Ill. App. 3d 284, 529 N.E.2d 808, where the court rejected the defendant's argument that the shifted burden of proof improperly required defendant to disprove the *mens rea* element of the crime. (*People v. McDarrah* (1988), 175 Ill. App. 3d at 295, 529 N.E.2d at 815; see also *People v. Martin* (1988), 166 Ill. App. 3d 428, 436, 519 N.E.2d 1085, 1090 (requiring defendant

to prove affirmative defense of insanity by preponderance of evidence did not violate due process).) We also decline to hold that the shifted burden of proof violates defendant's due process rights.

 Because we are upholding the constitutionality of this law, there was no error in submitting the Illinois patterned jury instructions, which correctly state this law, to the jury.

 ██ Finally, defendant argues that the trial court erred in granting the State's motion to remove two prospective jurors for cause. Whether a challenge for cause should be allowed rests within the sound discretion of the trial court, and its determination will not be set aside unless it is against the manifest weight of the evidence. (*People v. Harris* (1967), 38 Ill. 2d 552, 556, 232 N.E.2d 721, 723.) The burden is on the party objecting to the juror to show the prejudice of the juror. (*People v. Underwood* (1982), 108 Ill. App. 3d 846, 855, 439 N.E.2d 1080, 1086.) In the instant case, the State articulated its objection to juror Jackson as being that, in addition to Jackson's expressed disagreement with the proposition that a person is presumed innocent unless proven guilty, Jackson had been charged at one time with a burglary. This second factor alone shows possible prejudice to the State. The State's objection to juror Eise involved a person who had twice been the victim of a crime and said that he might be prejudiced because of it, but also a juror who broke down crying when questioned about it. We find that the State showed possible prejudice with this juror as well since the juror's emotional instability could have prevented him from rationally assimilating the evidence. In short, we find that the court did not abuse its discretion in allowing the State's challenges for cause with regard to these two jurors.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, J., concurs.

JUSTICE RARICK, specially concurring:

I write separately to express my concern with the manner in which the State obtained the order to have the defendant examined for fitness. The State did not file any type of pleading or serve any notice upon defendant or his counsel prior to seeking *ex parte* the examination order. Such *ex parte* orders are not to be condoned, especially in criminal cases. (See, *e.g., People v. Bryant* (1988), 176 Ill. App. 3d 809, 814, 531 N.E.2d 849, 852 (defendant has right to be

present at all proceedings affecting his substantial rights).) At least defendant or his counsel should have been present for the State's presentation of the motion. Because section 104—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 104—11) allows the court itself to raise the issue of a defendant's fitness for trial at any time and because it fails to set forth any procedure for obtaining such an examination, my concern does not rise to the level of dissent on this point. Furthermore, I agree with the majority opinion on all other issues. I too see no bad-faith motive for obtaining the fitness examination order, but I do see great potential for abuse in handling such orders in the manner the State pursued here. For these reasons, I specially concur.