(No. 59594.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CARRUS BUGGS, Appellant.

*Opinion filed May 12, 1986.*

286

SIMON, J., specially concurring.
MILLER and MORAN, JJ., dissenting.

G. Joseph Weller, Deputy Defender, and Kyle Wesen-

dorf, Assistant Defender, of Elgin, and Verlin R. F. Meinz, Assistant Defender, of Ottawa, all of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry and James M. Bailey II, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE CLARK delivered the opinion of the court:

In a 10-count indictment filed in the circuit court of Cook County, defendant, Carrus Buggs, was charged with six counts of murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1) through (a)(3)), one count of attempted murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—4), one count of aggravated battery (Ill. Rev. Stat. 1979, ch. 38, par. 12—4(a)), and two counts of aggravated arson (Ill. Rev. Stat. 1979, ch. 38, pars. 20—1.1(a)(1), (a)(2)). The defendant was tried in a bench trial and found guilty of all charges.

Buggs waived his right to have a jury in the sentencing phase of the proceedings. Thereafter, the trial judge sentenced him to death. The trial judge also sentenced Buggs to 60 years' incarceration in the Illinois Department of Corrections based on the attempted-murder and aggravated-battery convictions. Sentence was stayed (87 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603).

The offenses with which the defendant was charged occurred at approximately 3 a.m. on October 15, 1980, at the defendant's home. The defendant and his wife, Loretta, were arguing in their second-floor bedroom concerning his wife's alleged infidelity. The defendant concluded the fight by taking a gasoline can and splashing

gasoline on Loretta, down the hallway, and down the stairs. Buggs then reached into his pocket and took out a book of matches, lit a match, and threw it on the stairs, causing a fire.

Edna, the defendant's eldest daughter, watched the aforementioned incident take place. Upon seeing the flames, she rushed to save her youngest brother, Darryl. She entered his bedroom, pushed him and his bed toward the window, and proceeded to lift up the window and push the screen out. When she turned back to grab Darryl, he was no longer on the bed, so she jumped out of the window. Shortly thereafter, firemen arrived and removed Loretta's and Darryl's bodies from the burning house. Edna sustained second- and third-degree burns on her arms and legs, while three of her brothers and one of their friends, who had all been asleep in the house, escaped without serious injury. Loretta's death was attributed to the burns which covered 50% of her body. Darryl's death was caused by smoke inhalation and burns over 20% of his body.

The defendant admits committing the acts for which he was convicted. He does, however, raise one issue concerning the guilt phase of the trial, and various issues pertaining to the sentencing phase of the trial.

More specifically, the first issue presented for our review is whether the admission of prior "bad acts" by the defendant constituted reversible error.

Initially, the State argues that this issue is waived due to the defendant's failure to object at trial to the introduction of these prior violent acts. Because there was no post-trial hearing, the first time the defendant raised this objection was in this appeal. Normally, objections to the admission of such evidence are waived if not made at trial, *unless the error prevents a fair trial.* (See *People v. Bartall* (1983), 98 Ill. 2d 294.) Assuming, *arguendo,* that the introduction of evidence of the defendant's prior

violent acts was improper, we believe such an error could have prevented him from receiving a fair trial. Because this potentiality exists, we shall address this issue.

The defendant maintains that the introduction of his prior violent acts had no probative value and denied him a fair evaluation of his evidence of insanity. However, the State contends that the introduction of the defendant's prior violent acts was probative as to the circumstances under which Dr. Conroe, the defense psychiatrist, developed his diagnosis and as to the issue of defendant's insanity. We believe the evidence in question was properly admitted.

Dr. Conroe examined the defendant approximately three years after the incident. In forming his diagnosis, Dr. Conroe interviewed the defendant twice, for a total of $3^3/4$ hours. He also interviewed the defendant's brother, father, and stepmother for a combined total of $1^1/2$ hours. Dr. Conroe diagnosed the defendant's behavior at the time of the offense as an "Isolated Explosive Disorder." He stated that one of the diagnostic criteria was a *single* discrete episode in which the defendant's failure to resist an impulse led to a single externally directed act that had a catastrophic impact on others. On cross-examination, Dr. Conroe was presented with the fact that Buggs had previously stabbed a woman with a knife. Dr. Conroe responded that he was aware of that incident and that it did not change his diagnosis. Dr. Conroe was then presented with the fact that at one time Buggs had drawn a revolver and fired a shot in between his son's legs. This incident occurred during an argument with Buggs' wife six months prior to the offense complained of in this case. Dr. Conroe stated that he was not aware of that incident when he made his diagnosis. He then went on to admit that such an episode also had the potential of a violent externally directed act which could have a catastrophic impact on others.

Almost every aspect in a defendant's life is relevant when the defense of insanity is raised. (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 560.) The admission of prior violent acts by the defendant is therefore not necessarily precluded. (See *People v. Burress* (1971), 1 Ill. App. 3d 17.) However, *relevancy* remains a prerequisite for the admission of any evidence. (See *People v. Free* (1983), 94 Ill. 2d 378, 413.) It is also well established that wide latitude will be allowed in cross-examination of an expert witness. (*People v. Crawford Distributing Co.* (1978), 65 Ill. App. 3d 790, 799.) Therefore, when such a witness expresses an opinion as to a defendant's sanity, the scope of the inquiry into the basis for that opinion is broad. *People v. Moor* (1934), 355 Ill. 393, 397-98.

With these principles of law in mind, we must look to the testimony of Dr. Conroe. In this case the expert witness, Dr. Conroe, diagnosed the defendant as having suffered from an isolated explosive disorder on the date of the fire. Such a disorder concerns a "single discrete episode." Therefore, the brief questioning on cross-examination concerning previous episodes of violence by the defendant tended to negate the witness' diagnostic conclusion. There can be no question that such evidence was relevant and, thus, properly admitted.

The next issue raised by the defendant is whether the defendant knowingly and voluntarily waived his right to a jury for the death penalty hearing.

Once again, the State initially argues that the defendant's failure to object to this alleged error during the death penalty hearing has waived this issue for review on appeal. (As noted earlier, there was no post-trial hearing in this case, and therefore the first time this issue was raised was in this appeal.) However, there is an exception to the waiver rule where there has been plain error which has affected substantial rights. (*People v. Foster* (1979), 76 Ill. 2d 365, 380.) In this case, the al-

leged error concerns the defendant's constitutional right to a jury for his death penalty hearing. Under these facts, a substantial right of the defendant's has been affected and, thus, the exception to the waiver rule must apply.

In order to determine whether a proper jury waiver has occurred, we must look to the particular facts of each case. Prior to trial, the trial judge instructed the defendant that if he was convicted, he would be permitted to have a jury decide the second phase of the trial, the sentencing phase. The defendant was found guilty on September 1, 1983, at which time the prosecutor stated that the death penalty would be sought. Once more the trial judge advised the defendant that he was entitled to have a jury determine the sentence to be imposed. On September 27, 1983, the trial judge asked the defendant whether he wanted a jury or a judge to determine his sentence. The judge informed the defendant that he would not accept his decision until the date of the sentencing hearing in order to give the defendant more time to decide. The defendant then replied that he wanted the judge to decide his sentence. Whereupon, the trial judge inquired as to whether any promises were made to either the defendant or his attorney which would make the defendant prefer a bench trial over a jury hearing. Both the defendant and his attorney responded that neither of them had been made any promises. The trial judge then stated that he would make "the most solemn and difficult decision"; however, up until the time that the sentencing hearing was to begin, if the defendant wanted a jury, the trial judge would have permitted him to have one. The trial judge reiterated his point by stating, "I will, only at the very last moment, accept the jury waiver."

Before the October 12, 1983, death sentencing hearing, the trial judge asked the defendant if he still wished

to waive a jury and have the judge hear the evidence. The defendant persisted in his jury waiver. In response to the court's question, the defendant stated he had not been given any indication on how the trial judge would rule. The defendant then signed a jury waiver entitled, "for the penalty phase." Again, the court explained that the defendant could have 12 citizens determine whether there existed any aggravating factors that required the imposition of the death penalty, and weigh the aggravating and mitigating factors to determine whether the death penalty should be imposed. One last time, the trial judge asked the defendant if he wished a jury to determine the sentencing phase. The defendant responded that he understood what a jury trial was, but that he still wanted the trial judge to conduct the death penalty hearing.

The defendant now contends that his jury waiver was neither knowingly nor understandingly given. The defendant's underlying contention is based on the fact that the court did not inform him of the unanimity requirement before a death sentence can be imposed.

This court has repeatedly declined to adopt a rule that would expressly require our circuit courts to inform all defendants of the unanimity requirement before accepting jury waivers at death sentencing hearings. (*People v. Madej* (1985), 106 Ill. 2d 201, 220-21; *People v. Albanese* (1984), 104 Ill. 2d 504, 535; *People v. Brownell* (1980), 79 Ill. 2d 508, 536.) We continue to believe that the sixth amendment does not require a precise formula for determining whether a waiver has been knowingly and intelligently made. Each case will be decided on its own facts. *People v. Taylor* (1984), 101 Ill. 2d 508, 520.

It is evident from the facts of this case that the defendant knowingly and intelligently waived his right to have a jury determine his sentence. The defendant was given adequate time in which to reach his decision; he

conferred with his attorney, acknowledged that he comprehended the meaning of a jury trial, and understood that he was waiving a jury in order that the trial court determine his sentence. In addition, the trial judge repeatedly advised the defendant of his right to a jury, but the defendant persisted in his wish to have the court sentence him. Based on these facts, the trial judge properly accepted the defendant's jury waiver.

In this appeal, the defendant raises five issues alleging that the Illinois death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) is unconstitutional. All five of the defendant's contentions have previously been raised and rejected by this court. We will therefore not address them in this opinion.

The defendant's next contention is that in light of the significant mitigating evidence presented, this court should set aside his death sentence. The defendant admits that the offenses for which he was convicted are serious; however, he maintains that the death sentence in this case is excessive.

The defendant asserts, and we agree, that the mitigating circumstances of this case parallel those presented in *People v. Carlson* (1980), 79 Ill. 2d 564. In *Carlson*, the defendant was convicted of the premeditated shooting and burning of his ex-wife and of shooting a police officer who came to arrest him for his ex-wife's murder. Evidence in the case established that the defendant was an older man with a history of military service and no history of prior criminal activity. It also showed that the defendant's physical and mental condition had seriously deteriorated prior to the offense. Finally, it showed that the offense was ignited by another flare-up of long lasting marital discord. On appeal, this court set aside the death penalty imposed upon the defendant. In so doing, this court noted:

"These mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society. The Supreme Court has held that, while individualizing sentencing determinations generally reflects simply enlightened policy, in capital cases the fundamental respect for humanity underlying the eighth amendment 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) See also *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001. See generally, Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo. L.J. 97 (1979).

Focusing on the individual offender and the circumstances of the particular offense (and not on the fact that it was a peace officer who was killed), we see an individual with no past criminal record who would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events. We hold that the penalty of death should not be imposed upon the defendant." *People v. Carlson* (1980), 79 Ill. 2d 564, 590.

The mitigating circumstances in the case at bar twin those presented in *Carlson.* The evidence in the present case showed that the defendant, at the age of 17, enlisted in the Marine Corps and served for three years. While in the Marine Corps, he ultimately achieved the rank of corporal. After leaving the Marine Corps, he joined the Air Force. Thirteen years of service and elevation to the rank of staff sergeant followed. Upon leaving the Air Force, Buggs joined the Army. He served for approximately five years there, becoming a military policeman and drill instructor. He was honorably discharged from the military in 1974, after 21 years of service to his country. Throughout this time, the defendant

had no prior history of serious criminal activity.

The evidence also showed the defendant had a drinking problem which had previously resulted in blackouts. The defendant testified that he had been drinking heavily in October of 1980, the time of the offense. The defendant testified that the major reason for his drinking problem was his marital situation. Loretta had continually asked the defendant for a divorce; however, he tried to persuade her to work out their problems. Instead of solving their problems, Loretta began entertaining various boyfriends at their home when the children were present.

The problems with his family and with alcohol obviously bore on the defendant's mental state in October of 1980. On the day of the offense, the defendant testified that one of Loretta's boyfriends persistently telephoned, which led to their final argument. During the argument, Loretta told the defendant he was not the father of two of their sons. At that point, the defendant became outraged, poured gasoline on Loretta and the stairway, lit a match, and fled.

As in *Carlson*, had it not been for this marital disharmony and a dispute which triggered this tragic sequence of events, Buggs would presumably be leading a life acceptable to our society. While we in no way condone the defendant's heinous criminal actions, we do not believe that the circumstances present in this case "bespeak a man with a malignant heart who must be permanently eliminated from society." (79 Ill. 2d 564, 590.) Therefore, we vacate the defendant's death sentence.

Due to the disposition of this issue, we need not address the remaining issues presented.

The convictions and sentences of the defendant based on the attempted-murder and aggravated-arson charges, are affirmed. The convictions of the defendant based on the murder charges are affirmed. The penalty of death

for the murder convictions is set aside and the cause remanded to the circuit court of Cook County with directions to impose a sentence on the defendant other than death.

*Judgments affirmed; death sentence*
*vacated; cause remanded,*
*with directions.*

JUSTICE SIMON, specially concurring:

As the majority opinion points out, this court "has repeatedly declined to adopt a rule that would expressly require our circuit courts to inform all defendants of the unanimity requirement before accepting jury waivers at death sentencing hearings." (112 Ill. 2d at 292.) I believe that fairness requires that defendants be so informed, however, and that judicial economy would be well served by such a rule in view of how often this issue arises in post-trial and appellate argument. The same question also often arises in connection with jury instructions.

In some cases, such as the present, there is no indication that any explanation of the unanimity rule was given to the defendant by the court. Rather, the assumption seems to be that the defendant's attorney must have explained the rule in the course of obtaining the defendant's waiver of a jury. That assumption may or may not have any basis in reality, and in the absence of an explanation of the rule by the court and careful inquiry as to whether the defendant understands its application to the sentencing hearing, there is no way of determining on review whether the defendant was properly informed.

In other cases, a partial or inaccurate explanation has been given to the defendant by the court, leaving to the defendant the task of divining the consequences of the rule as it applies to the imposition of the death penalty. I would require a trial judge to inform a defendant that if

he opts for a jury at his sentencing hearing, the death penalty can be imposed only if all 12 jurors agree that it should be, and in addition, that if even one juror disagrees, the death penalty cannot be imposed.

While I agree that there is no precise formula for determining whether a waiver has been knowingly and intelligently made, the rule I propose would eliminate the ambiguity that now frequently calls into question the sufficiency of otherwise valid waivers. Ambiguity or uncertainty regarding the fairness of any step of proceedings involving the death sentence is intolerable, especially when it would be so simple to eliminate the problem and any attendant uncertainties.

JUSTICE MILLER, dissenting:

In determining that death is not the appropriate sentence here, the majority relies on *People v. Carlson* (1980), 79 Ill. 2d 564, another case in which a sentence of death was found to be excessive. The majority points to certain factual similarities between this case and *Carlson* and concludes that the same result is warranted here. I disagree, for the two cases are fundamentally different, and in the circumstances present here I would not disturb the trial judge's finding that the death sentence is appropriate. Accordingly, I dissent.

In *Carlson* the defendant shot and killed his former wife and set her house on fire; several hours later, at the time of his arrest, the defendant shot and killed a police officer. The State sought the death penalty for the officer's murder, and the defendant was sentenced to death in a bench proceeding. On appeal this court held that in imposing the death penalty the trial judge had disregarded or ignored several important mitigating circumstances that were present in that case. First, the court found that the trial judge had incorrectly considered the offenses leading up to the officer's murder as evidence

of a history of criminal conduct. The defendant had no other record of criminal activity, and together the offenses could be viewed as "all a part of one unfortunate and tragic event." 79 Ill. 2d 564, 588.

Also, the court in *Carlson* rejected the trial judge's finding that the defendant was not acting under an extreme mental or emotional disturbance at the time of the officer's murder. Rather, the evidence showed that in the several years preceding the murder of the police officer the defendant had suffered a number of serious physical ailments, including two heart attacks, and that during that time he had undergone "a slow grieving process related to the loss of the affection of his wife" (79 Ill. 2d 564, 585). This evidence supported a psychiatrist's testimony that the defendant was distraught and suicidal at the time he killed the officer. *Carlson* also explained that the trial judge, in rejecting the expert testimony, had misunderstood the basis for the psychiatrist's opinion.

Finally, as further evidence of mitigation, the court in *Carlson* noted favorably the defendant's concern for the well-being of his son, apparent in the defendant's attempts shortly before his arrest to relay a sum of money to the child. (79 Ill. 2d 564, 589-90.) In light of those mitigating circumstances, which the trial judge had disregarded or failed to consider, the court in *Carlson* held that the sentence of death was excessive, that the circumstances present in that case did not "bespeak a man with a malignant heart who must be permanently eliminated from society." 79 Ill. 2d 564, 590.

To be sure, this case is similar to *Carlson* in certain respects. Like the defendant in *Carlson*, the defendant here was a man in his forties with no criminal record, and here, as in *Carlson*, the conduct for which the defendant was sentenced to death stemmed from marital conflict. In other, more important respects, however, the two cases are different, and I do not believe that *Carl-*

*son* governs here.

The majority's description of the events preceding the tragic fire here suggests that the defendant's conduct was an isolated occurrence provoked or triggered by a dispute with his wife that began over telephone calls from her lover and ended with a taunt or revelation concerning the paternity of two of the family's six children. This is misleading, however, for it obscures an important ground on which the trial judge relied in sentencing the defendant: that the defendant had planned all along to set the fire. Indeed, the majority fails to question or consider why the defendant happened to have the gasoline with him at the time of the argument with his wife. The explanation offered by the defendant—that he purchased the gasoline that night for use in a lawn mower and was storing it in the bedroom to keep it from his oldest son because the gasoline had value and his son was a thief— was contradicted by the prosecution in several respects. Specifically, the State introduced evidence showing that the family did not own a gasoline-powered mower at the time in question and that the lawn was regularly cut by one of the sons, who for that purpose would borrow a gasoline-powered mower from a neighbor. The trial judge expressly rejected the defendant's explanation for the purchase of the gasoline and found instead that the defendant had obtained it for the purpose to which it later was put.

Moreover, the trial judge carefully considered the psychiatric evidence presented by the defendant and the State and concluded that the defendant was not acting under an extreme mental or emotional disturbance at the time of the offenses. The trial judge believed that the defendant was "extremely angry" rather than extremely depressed and, in addition, found that the defendant was not intoxicated when he set the fire. In sentencing the defendant to death, the trial judge ex-

plained:

> "So I will have to find that he was not under the influence of extreme mental or emotional disturbance. That he deliberately and coolly planned to do what he did. He took the time to go out and purchase the gasoline and, in a container, come back to his home, splash it upon his wife, up and down the stairs, set the place on fire with the apparent knowledge that at least most, if not all of his family were in there.
>
> I feel this is a most vicious, brutal and heinous crime. I feel that the application of the death penalty should be imposed. Accordingly, the defendant will be sentenced to death * * *."

I would note too the evidence of other acts of violence involving the defendant: that he was involved in a knife fight with a woman, and that during a family quarrel he fired a gun at his oldest son. On the night of the fire, the defendant's wife and all but one of the children were in the house; as the trial judge found, the defendant's violent plan threatened the lives of all the occupants, and two members of the family died. The mitigating circumstances found to exist in *Carlson* are for the most part absent here, and taken with the defendant's past conduct, the offenses committed in this case, I believe, could be considered to "bespeak a man with a malignant heart" (*People v. Carlson* (1980), 79 Ill. 2d 564, 590). In setting aside the death sentence here as excessive, the majority substitutes its judgment for that of the trial judge. The decision to impose the death penalty finds ample support in the record, and I would let it stand.

JUSTICE MORAN joins in this dissent.