THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MYNOR GIL *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—90—3615, 1—91—0233 cons.

Opinion filed December 14, 1992.

152

O'Connor & Kelly, of Chicago (William J. O'Connor, of counsel), for appellant Mynor Gil.

Rita A. Fry, Public Defender, of Chicago (Stephanie L. Ellbogen, Assistant Public Defender, of counsel), for appellant George Perez.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and John E. Gilhooly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a double jury trial in the circuit court of Cook County, defendants Mynor Gil and George Perez were found guilty of first degree murder. Perez was sentenced to 25 years' imprisonment; Gil was given a 20-year sentence. Defendants filed separate appeals, which this court consolidated. For the following reasons, we affirm.

The records on appeal indicate that following hearings on motions *in limine* and jury selection, the State called Chicago police officer Paul Velasquez as the first witness at trial. Officer Velasquez testified that on November 21, 1988, he was off duty, driving northbound on Western Avenue. He was slowing down for a stoplight near 18th Street when he heard two gunshots. Officer Velasquez looked to his right, where he saw a silver 1975 Ford Grenada stopped alongside a Chicago Transit Authority (CTA) bus shelter. He saw the car speed away from the shelter and noticed a man standing inside the enclosure. The car turned onto 18th Street, where it again stopped even

with the bus shelter. Officer Velasquez then saw and heard three or four more gunshots from the rear passenger side of the Grenada, fired toward the man at the shelter, who was later identified as Epifanio Guzman Mendez. At the same time, Mendez picked up a bottle and threw it toward the car; the bottle fell short of the car. The Grenada sped away and Mendez fell to the ground. Officer Velasquez went to a nearby telephone to notify the police of the shooting and give a description of the car.

Officer Velasquez then returned to the scene of the shooting to attempt to aid the victim. Shortly thereafter, the first police car and an ambulance arrived on the scene. About 15 minutes later, Velasquez saw police officers return with the Grenada. According to Velasquez, he did not see any other persons or cars in the area at the time of the shooting.

On cross-examination before the Perez jury, Officer Velasquez admitted he did not see the first two gunshots. He also stated that the intersection where the shooting occurred is a well-lit main intersection. On cross-examination before the Gil jury, Officer Velasquez admitted that he could not see Mendez when he heard the first shots. He also added that he found glass on Western Avenue in the area where the bottle fell.

Chicago police officer David Koziol testified before both juries that on the date in question, he responded to the report of the shooting. While at the scene, he saw Officer Ann Cleary arrive in a silver Ford Grenada, search the car and recover a chrome revolver from the rear driver's area. Officer Koziol also recovered a fired bullet from the rear of the bus shelter.

On cross-examination before the Perez jury, Officer Koziol testified that he also saw Officer Cleary remove six spent cartridges from the revolver. Officer Koziol took no pictures of the Grenada, but observed nothing unusual, such as broken windows or bullet holes, to photograph. Officer Koziol stated that a photograph was taken of the bullet hole in the bus shelter. On cross-examination before the Gil jury, Officer Koziol stated that he did not find any broken glass at the scene and that Officer Velasquez did not direct him to broken glass. He also stated that he did not examine the Grenada for bullet holes and did not observe the passenger side of the car at the scene.

Officer Ann Cleary testified before both juries that she heard the reports of the shooting while on patrol on the night in question. The radio message also contained a description of the silver Grenada. At the intersection of Roosevelt and Loomis, she saw a silver Grenada containing four male Hispanics driving eastbound on Roosevelt and

turning onto Loomis. Officer Cleary and her partner followed the Grenada for several blocks, when the Grenada turned the wrong way onto a one-way street. Officer Cleary activated the squad car's mars lights and attempted to stop the Grenada. Officer Cleary saw the left rear passenger bend down and sit up several times. The Grenada stopped over a full city block later.

Officer Cleary testified that the occupants of the Grenada were ordered out of the car. Officer Cleary stated that the driver was later known as Horatio Albor, the front passenger was later known as Manuel Sifuentes, the right rear passenger was later known as Perez and the left rear passenger was known as Gil. Officer Cleary stated that it was Gil whom she saw bending down and sitting up while she was stopping the Grenada. She drove the Grenada back to the scene of the shooting, where it was identified by Officer Velasquez. Officer Cleary searched the car, finding a chrome .357 Smith & Wesson revolver with six spent cartridges under the rear driver-side seat. The car, gun and bullets were taken to the police station. The gun and bullets were identified in court by Officer Cleary. On cross-examination before the Perez jury, Officer Cleary stated that there was no high-speed chase involved and that she saw no bullet holes or broken windows on the Grenada.

Officer Vincent Lomoro, who was employed for 26 years in the firearms identification section of the Chicago police department crime laboratory, testified that after examining the bullet recovered from the scene and the gun recovered from the Grenada, he concluded that the gun had fired the bullet.

Officer James Spratte, a gang crimes specialist with the Chicago police department, testified that in November 1988, The La Raza and Party People street gangs were at war with the Disciples street gang. Officer Spratte identified Gil as a member of La Raza and Perez as a member of the Party People.

Doctor Tae An, an assistant medical examiner for the Cook County medical examiner's office, testified that he performed an autopsy on Mendez on November 22, 1988. Dr. An observed that Mendez had suffered bullet wounds to the back and mid-abdomen. As a result of the autopsy, Dr. An concluded that the cause of Mendez' death was the gunshot wound to the back.

Detective Michael Puttin testified that on November 21, 1988, he was assigned to the shooting at issue. Arriving at the police station, he discovered that four suspects had been taken into custody and were being held in the same room. Detective Puttin immediately instructed officers to separate the suspects. Before their respective

juries, Detective Puttin testified that after informing defendants of their constitutional rights he obtained statements from each. He then contacted the State's Attorney's office felony review unit. In the early morning hours of November 22, 1988, Assistant State's Attorney James Tyrell arrived and, after informing defendants of their constitutional rights, obtained signed written statements from Gil and Perez.

James Tyrell corroborated these later events in his testimony before each jury. He then published each defendant's written statement to his respective jury, the contents of which were similar to the oral statements to which Detective Puttin had testified.

In his written statement, Gil indicated that on the night in question, he and others planned their evening and decided they would "get some Disciples" because a friend of Perez had been hospitalized after being beaten by the Disciples. When Perez got into the back seat of the car, Gil saw Perez had a gun. On 19th Street, Gil saw a man he recognized as a Disciple get out of a car and enter a liquor store. Gil admitted he was a member of the Party People. The car in which Gil was riding followed the other car to the corner of 18th and Western. Gil was sitting behind the driver; Perez sat next to Gil. At the corner, a man got out of the other car and threw a bottle at their car, then ran. Perez took out his gun and fired it six times. Gil believed that the Disciple ran away and that Mendez was shot by accident. After Perez fired his gun, the four men drove off in pursuit of the car containing Disciples, but were pulled over by the police. As their car was being pulled over, Perez gave the gun to Gil and told Gil to hide it. Gil hid the gun under the rug behind the driver's seat.

The written statement taken from Perez was substantially similar to Gil's written statement. One difference was that Perez stated that the man who got out of the other car reached into his coat before Perez fired his gun.

Three witnesses testified for defendants. The first was Mr. Kenneth Cleveland, a CTA bus driver. He testified that on November 21, 1988, while stopped at the intersection of 18th and Western at about 8:15 p.m., he saw a man apparently pleading for his life with a group of other men. He heard gunshots and saw the man fall to the ground as the others ran away. Mr. Cleveland returned to the intersection later in the evening, but saw nothing. Mr. Cleveland admitted that he was unable to identify this victim and that he made no report of the incident. Moreover, Mr. Cleveland could testify only that these events occurred "around" November 21, 1988. He admitted that there was a lot of violent activity on his bus route. Mr. Cleveland also

testified that he was not warned of trouble in the area by another bus driver.

Mr. Ernest Jefferson, another CTA bus driver, testified that a man fired three shots at his bus as he drove through the intersection at issue at about 8:15 p.m. on the night in question. On his return route 45 minutes later, Mr. Jefferson saw no one at the intersection. He testified that shortly after being fired upon, he saw and warned Mr. Cleveland of trouble at the intersection. Mr. Jefferson did not report this incident and found dents, rather than bullet holes, in the back of his bus.

Manuel Sifuentes testified before both juries that on November 21, 1988, he went to Horatio Albor's house to ask for a ride home. He, Albor, Gil and Perez all rode in Albor's car. Albor drove, Sifuentes rode in the front passenger seat, Perez rode in the rear behind Sifuentes, and Gil sat behind Albor. Sifuentes testified that while they were driving on 18th Street, the car in front of theirs stopped; Sifuentes denied that they were following this car. According to Sifuentes, a man got out of the other car and went for his waist. Sifuentes heard two gunshots coming from outside the car and ducked down. He then heard shots from inside the car. Albor drove back toward his house. After the police stopped their car, Sifuentes noticed bullet holes in the front of the car.

On cross-examination, Sifuentes denied belonging to the Party People street gang. He admitted that he never saw anything in the hand of the man from the other car. Sifuentes stated that there were no other people in the area at the time of the shooting. Sifuentes admitted that he did not tell the police that someone had been shooting at them either after their car was stopped or at the police station. Nor did Sifuentes mention it to the assistant State's Attorney when he gave a statement.

In rebuttal, Officer Koziol testified that he examined the Grenada in the early morning of November 22, 1988, and found no bullet holes. He admitted that the Grenada was accidentally destroyed after nobody came to claim it.

Assistant State's Attorney Tyrell testified that he had taken a statement from Sifuentes hours after the shooting in which Sifuentes did not mention seeing bullet holes in the Grenada, but did state that the person from the other car had a bottle in his hand.

Detective Puttin testified that he had spoken with Sifuentes after the shooting. According to Detective Puttin, Sifuentes stated at that time that two voices in the back seat yelled "Disciples!" when they noticed the car in front of them on 18th Street. Sifuentes also told

158

Detective Puttin that the man from the other car got out with a bottle in his hand, at which time he heard gunshots from within the Grenada. Sifuentes did not mention that he saw bullet holes in the Grenada.

Officer Spratte testified that Sifuentes had admitted that he was a member of the Party People two months before the shooting. Following closing arguments, the juries found their respective defendants guilty of first degree murder. Gil and Perez now appeal.

I

Gil argues that the State failed to prove that he was accountable for murder. Gil contends that the evidence against Perez is circumstantial and is not inconsistent with a reasonable hypothesis of innocence. The State correctly notes that the "reasonable hypothesis" standard is no longer the law in Illinois. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.) The standard of review is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

In this case, Officer Velasquez testified that the gunshots were fired from the rear passenger side of the Grenada where, according to Perez's written statement and Officer Cleary's testimony, Perez was sitting. The defendants' statements also indicate that Perez fired his gun at the victim. Officer Velasquez saw Mendez fall to the ground after these shots were fired. A bullet found on the scene matched Perez's gun. Mendez died from a gunshot wound.

Gil relies on Sifuentes' testimony to argue that Mendez was shot by the Disciples. Officer Velasquez, however, testified that there were no other vehicles or people in the area during the shooting. It is axiomatic that it is the jury, not this court, that assesses the credibility of the witnesses. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190.) Viewed in the light most favorable to the State, a rational jury could have concluded that Perez was guilty of murder.

Gil next contends that the State failed to prove that he was accountable for the shooting. A person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he so-

licits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) Under the "common design rule" embodied in section 5—2(c) of the Criminal Code of 1961, the State need only prove that defendant had the specific intent to promote or facilitate a crime to hold defendant accountable for any criminal act done in furtherance of the intended crime. (*People v. Waln* (1988), 169 Ill. App. 3d 264, 274, 523 N.E.2d 1318, 1325.) The State also may prove accountability by showing that the defendant attached himself to another bent on illegal acts with knowledge of the illegal design. (See *People v. Harris* (1990), 196 Ill. App. 3d 663, 671, 554 N.E.2d 367, 373.) Although the mere presence of a defendant at the scene of the crime does not render him or her accountable for that crime, a number of factors, including "proof that *** he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability." *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-11, 460 N.E.2d 847, 850.

■ Here, Gil's written statement indicated that the four men in the Grenada had "planned their evening" and that they decided to "get some Disciples" because a friend of Perez was hospitalized from a beating by the Disciples. Gil saw Perez had a gun when he got into the Grenada. Defense counsel contends Gil may have believed that Perez was carrying the gun for self-defense. However, given that Gil stated that the four men set out to "get some Disciples," a rational juror might well conclude that defendants' actions were consistent with provocation rather than self-defense.

Furthermore, Gil admitted he saw a Disciple get out of a car they were following. According to Detective Puttin, Sifuentes heard both voices in the back seat yell "Disciples!" when they spotted the car. Thus, a rational jury could conclude that Gil identified the Disciple knowing that Perez was armed and seeking revenge for the beating of his friend by the Disciples. The record does not show that Gil ever sought to disassociate himself from Perez or the others. Indeed, both defendants admit that after the shooting, Gil hid Perez's gun. These circumstances permit the inference that Gil attached himself to persons bent on illegal acts, with knowledge even of Perez's illegal design.

Gil argues that the State never proved that the phrase "to get some Disciples" meant "to perform some illegal act." However, the State presented evidence of circumstances from which a rational jury could infer that this is exactly what the phrase meant. Gil argues that

the State failed to prove that specific illegal activity was planned and thus failed to prove specific intent. However, as noted above, the State need only prove that Gil intended to promote or facilitate *a* crime; there was no need to prove that Gil specifically intended to promote or facilitate a murder.

In sum, a rational juror could have found Gil accountable for the murder of Epifanio Mendez.

## II

Gil contends that the trial court erred in allowing the State to impeach Sifuentes with his post-arrest silence. Gil argues that the admission of the post-arrest silence violates Illinois evidentiary law. As Gil did not assert the foundational defect at trial, the issue could be deemed waived. See *People v. Coleman* (1989), 129 Ill. 2d 321, 340, 544 N.E.2d 330, 339.

Even if the issue had been preserved, it would not have persuaded this court. In *People v. Godsey* (1978), 74 Ill. 2d 64, 72-73, 383 N.E.2d 988, 992, the Illinois Supreme Court indicated that impeaching a defense witness with his or her post-arrest silence regarding an incident in which the witness and defendant were involved may unfairly prejudice a defendant because a jury may infer guilt on the part of the witness and transfer that inference to the defendant. (*Godsey*, 74 Ill. 2d at 75-76, 383 N.E.2d at 993-94.) Nevertheless, a witness may be impeached with his or her failure to offer an exculpatory explanation when his or her exculpatory trial testimony is manifestly inconsistent with statements made after arrest. (See, *e.g.*, *People v. Nolan* (1987), 152 Ill. App. 3d 260, 267, 504 N.E.2d 205, 211 (defendant as witness).) The latter situation is more impeachment by prior inconsistent statement than by post-arrest silence.

■ The record here indicates that Sifuentes gave statements to the police and the assistant State's Attorney following his arrest. Sifuentes did not mention that the Grenada had been fired upon in those statements, which is manifestly inconsistent with his trial testimony. The record indicates that the State failed to lay a foundation at trial establishing that Sifuentes gave statements to the police and assistant State's Attorney. This could be considered error. (*Godsey*, 74 Ill. 2d at 72, 383 N.E.2d at 992.) However, as Sifuentes' testimony on cross-examination and the State's rebuttal evidence indicate that Sifuentes made statements after his arrest, the error, if it had been preserved for review, would have been deemed harmless.

### III

Next, Gil and Perez both contend that the trial court erred by granting the State's motion *in limine*, which precluded defendants from cross-examining Dr. An on a statement in the medical examiner's report. Generally, wide latitude is allowed in the cross-examination of an expert witness. (*People v. Buggs* (1986), 112 Ill. 2d 284, 290, 493 N.E.2d 332, 334.) Nevertheless, rulings regarding the scope of cross-examination, including rulings on motions *in limine*, will not be reversed unless there is a clear abuse of discretion by the trial court. (See *People v. Ortiz* (1990), 207 Ill. App. 3d 1, 9, 565 N.E.2d 228, 233; *People v. Escobar* (1988), 168 Ill. App. 3d 30, 43, 522 N.E.2d 191, 199.) Section 115—5.1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, par. 115—5.1) provides, in relevant part:

> "In any civil or criminal action the records of the coroner's medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons or autopsies, or both, and kept in the ordinary course of business of the coroner's office, duly certified by the county coroner or chief supervisory coroner's pathologist or medical examiner, shall be received as competent evidence in any court of this State, to the extent permitted by this Section. These reports, specifically including but not limited to the pathologist's protocol, autopsy reports and toxicological reports, shall be public documents and thereby may be admissible as prima facie evidence of the facts, findings, opinions, diagnoses and conditions stated therein.

> A duly certified coroner's protocol, or autopsy report, or both, complying with the requirements of this Section may be duly admitted into evidence as an exception to the hearsay rule as prima facie proof of the cause of death of the person to whom it relates. The records referred to in this Section shall be limited to the results of post-mortem examinations of the findings of autopsy and toxicological laboratory examinations."

In this case, the report of the post-mortem examination concludes with the following:

> "*OPINION:*

> The subject was reportedly shot on the street, during exchange of gunfire. Death is considered to be related to gunshot wound of the back lacerating inferior vena cava, intestine, and mesentery."

An offer of proof made during consideration of the State's motion *in limine* indicates that the medical examiner's information regarding the circumstances of death is usually obtained from the medical investigators, who in turn get their information from witnesses and the police. However, Dr. An was not sure of the source of the information regarding an "exchange of gunfire" in this case. The trial court also noted the statement of one of the defense attorneys that Dr. An did not rely on the disputed statement in reaching any of his findings.

■ Although parties may be given latitude to cross-examine an expert witness, the evidence to be elicited must be relevant to be admissible. (*Buggs*, 112 Ill. 2d at 290, 493 N.E.2d at 334.) Evidence may be rejected as irrelevant if it is uncertain, remote or would possibly cause unfair prejudice. (*People v. Castro* (1989), 190 Ill. App. 3d 227, 239, 546 N.E.2d 662, 669.) Based on the record, the trial court may have concluded that the contested statement was too uncertain. Section 115—5.1 does not affect the relevancy analysis; it provides that such statements may be admitted, but does not mandate admission. Moreover, the statement at issue may fall outside the scope of "results" or "findings" referred to in the statute. Therefore, the trial court acted within its discretion.

IV

■ Perez contends that he was denied a fair trial because the trial court granted the State's motion to excuse venireman Darryl Butler for cause. The decision to grant or deny a challenge for cause rests within the discretion of the trial court. *People v. Seaman* (1990), 203 Ill. App. 3d 871, 889, 561 N.E.2d 188, 200.

In this case, the State moved to strike Mr. Butler because he had denied that he had ever been an accused, a complainant or a witness in a criminal case on his juror information form. The record indicates that the State produced a "rap sheet" indicating that Mr. Butler had been charged in one case and a defendant in another. The trial court noted that it asked Mr. Butler about addresses on the "rap sheet" and that Mr. Butler smiled and understood "what was happening in terms of the Rap Sheet."

A venireperson may be excused for cause where he or she has been previously charged with various crimes. (*Seaman*, 203 Ill. App. 3d at 889, 561 N.E.2d at 200.) Thus, we conclude that the trial court acted within its discretion, particularly considering the indicia of dishonesty appearing in the record.

## V

Perez contends that the trial court erred by denying his motion *in limine* to preclude the State from mentioning that his prior felony conviction was for the unlawful use of a weapon. Perez did not testify at his trial, which waives the issue on appeal. See *People v. Hartfield* (1985), 137 Ill. App. 3d 679, 684, 484 N.E.2d 1136, 1139.

■ Even if the argument had been preserved, it would not have prevailed. A trial court may, in its discretion, permit impeachment by evidence of a prior conviction when: (1) the offense was punishable by more than one year of imprisonment or involved dishonesty; (2) the conviction or release from confinement occurred within the preceding 10 years; and (3) the prejudicial effect of admitting it does not outweigh its probative value. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Perez does not contend on appeal that the prior conviction in this case does not meet the first two criteria set forth in *Montgomery*. Instead, Perez notes that under certain circumstances, the trial court may limit the State to referring to the conviction as a felony without identifying the crime. (*People v. Williams* (1985), 137 Ill. App. 3d 736, 743, 484 N.E.2d 1191, 1197.) Indeed, Perez contends that the "mere fact" approach taken in *Williams* should always apply. (*Cf. People v. Kunze* (1990), 193 Ill. App. 3d 708, 728-36, 550 N.E.2d 284, 297-303 (Steigmann, J., specially concurring).) However, Justice Steigmann's concurrence in *Kunze* itself suggests that this is not the law in Illinois. Thus, it appears that the trial court acted within its discretion in denying Perez's motion *in limine*.

## VI

Finally, Perez argues that he was denied a fair trial due to the State's comments during closing arguments. Prosecutors have wide latitude to comment on evidence and draw reasonable inferences therefrom and, absent a clear abuse of discretion, a court's rulings on the scope of such comments will not be reversed on appeal. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688, 696.) Prosecutors may not, however, argue facts not in evidence. (See *People v. Beier* (1963), 29 Ill. 2d 511, 516, 194 N.E.2d 280, 283.) Even so, such remarks do not warrant reversal unless they are so prejudicial that they constitute a material factor in the defendant's conviction. *People v. Townsend* (1985), 136 Ill. App. 3d 385, 394, 483 N.E.2d 340, 347.

■ Perez argues that it was improper for the State to argue that the shooting was an act of retribution. Given the record in this case,

we cannot say that characterizing the shooting as motivated by the hospitalization of Perez's friend was an unreasonable inference from the evidence.

Perez argues that it was improper for the State to argue that the four suspects collaborated on a common defense while held together at the police station. The record indicates that when defense counsel objected to this argument, the trial court instructed the jury to disregard any argument not based upon the evidence. Thus, any error in this regard was cured. See *People v. Cisewski* (1987), 118 Ill. 2d 163, 178, 514 N.E.2d 970, 976.

Perez next argues that the State improperly referred to Sifuentes as a "hired liar." The record shows that Sifuentes' testimony was impeached on a number of points at trial, which might justify characterizing Sifuentes as a liar. (See *People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174, 182.) However, as the State conceded at oral argument, there was no evidence that Sifuentes was paid for his testimony. Thus, the characterization was improper.

Perez contends that it was improper for the State to argue in rebuttal that the police would have taken photographs of the Grenada if there had been bullet holes in the car. The trial court overruled defense counsel's objection on this point.

The record indicates that Officer Koziol testified that he examined the Grenada and found no bullet holes. The record further indicates that Officer Koziol testified that he did not see anything unusual about the car that would require that it be photographed. Thus, we cannot conclude that the trial court abused its discretion on this point.

In sum, given the record on appeal, we cannot conclude that the impact of the single uncured improper argument was so prejudicial that Perez was denied a fair trial. *People v. Faysom* (1985), 131 Ill. App. 3d 517, 525, 475 N.E.2d 945, 952.

For all of the the aforementioned reasons, we affirm the judgment of the circuit court of Cook County. As part of our judgment, we grant the State's request and assess the defendants $50 as costs for this appeal and $25 for the costs of oral argument.

Affirmed.

O'CONNOR and MANNING, JJ., concur.